946 F.2d 544
 Jason LOSINSKI, Jacob Losinski and Jennifer Losinski, all
minor children by their guardian ad litem, et al.,
Plaintiffs-Appellants,
v.
COUNTY OF TREMPEALEAU, Regent Insurance Company and Darrell
L. McBride, et al., Defendants-Appellees.
 No. 90-3254.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 16, 1991.
Decided Oct. 24, 1991.
Rehearing and Rehearing En Banc
Denied Jan 9, 1992.
 
 Jeff P. Brinckman (argued), Brinckman & Brinckman, LaCrosse, Wis., for plaintiffs-appellants.
 Robert Dreps (argued), Earl H. Munson, Lafollette & Sinykin, Madison, Wis., for defendants-appellees Regent Ins. Co. and County of Trempealeau.
 William Adler (argued), Eau Claire, Wis., for defendants-appellees Star Pool, Robert R. Hovell, Jr. and Darrell L. McBride.
 Before CUMMINGS, CUDAHY and RIPPLE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 This case involves the scope of liability under the substantive component of the due process clause and Wisconsin negligence law for the alleged failure of a deputy sheriff to protect a domestic violence victim from her husband, who shot and killed her in the deputy's presence. In DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court declared most instances of "private violence" outside the scope of the due process clause. We must determine whether the duty assumed by the deputy falls within the narrow "special circumstances" exception retained in DeShaney and whether the duty provides a cause of action under Wisconsin law.I.
 
 A. Background
 
 2
 On September 2, 1989, a domestic fight erupted between Donald and Julie Losinski at their farm near Arcadia, Wisconsin. Julie called her mother, Marion Simon, and pleaded for help. Marion's husband, James, called the Trempealeau County Sheriff's Department.
 
 
 3
 Sheriff's deputy Duane Stoner and James Simon went to the Losinskis' trailer home. Deputy Stoner stated in a written report that, "All of a sudden the door flew open and this male subject [Donald] came running at Mr. Simon hollering, 'you get the f--- off my property you SOB.' " Deposition of Duane Stoner (May 9, 1990) at 10 (reading Ex. 1). The deputy states that Julie and the three children then ran from the trailer carrying clothes. He wanted to leave quickly because he feared that he would need to fight Donald. Id. at 11. Donald continued to be outraged until Stoner said, " 'I am the law in this county, and at this time I think it is best that the kids go with their mother, and if you scream at me one more time I am putting you under arrest and you are going to jail.' " Id. at 15. The group left the farm, and Deputy Stoner advised Julie to seek court protection.
 
 
 4
 On Tuesday, September 5, 1989, Julie obtained a TRO from a Trempealeau circuit judge, pursuant to Wisconsin law. Wis.Stat.Ann. § 813.12 (West 1985 & Supp.1990). The "no contact" TRO prohibited Donald from contacting or causing any person other than an attorney to contact Julie without her written consent. The Sheriff's Department received a copy of the TRO on September 5, and Deputy Tim Hovell personally served Donald with a copy on the same day. Another copy was placed in the dispatch center of the Sheriff's Department and a third copy was posted on the bulletin board in the squad room.
 
 
 5
 Julie commenced divorce proceedings. On September 11, Julie and Donald appeared before the Family Court. The commissioner granted Julie's request to return to the trailer to retrieve certain items of personal property she and her children needed. She prepared a list of needed items which included a note indicating her hope that she and Don could discuss a few items on September 13 at a hearing to determine whether an injunction would replace the TRO. For an unknown reason the injunction hearing was canceled, so Julie made plans to pick up her belongings on September 13.
 
 
 6
 Marion Simon was to accompany Julie to the farm, and the two sought police protection in light of Donald's violent tendencies and the guns he kept in the trailer. Sheriff McBride agreed to send a deputy, and on September 13 Deputy Robert Hovell met the pair and Craig Goodroad, Julie's brother-in-law, at 9:20 on a country road on the way to the Losinski trailer. Craig believes that Julie was fearful about going to the trailer without police protection:
 
 
 7
 [Julie] was aware that there was loaded guns, she was aware that there was loaded guns, she had told us that she had taken some bullets out of a gun and so on, and Don, he was beginning to be real abusive to her, and to my knowledge there was just a safety precaution. She did say that she wouldn't go on that farm without a deputy while we were sitting there waiting for the deputy. She said, "No way am I going to go and get my stuff without the deputy."
 
 
 8
 Goodroad Dep. at 9-10. Marion states that Julie told Deputy Hovell that the TRO was in effect, at least until 11:00 that day. Simon Affidavit at 41. Marion's affidavit also indicates that she "was concerned" about the situation at the Losinskis, that she told him, "Donald might try to shoot Julie" and that she warned him that there were "loaded guns inside the house." Id. at 42-43.
 
 
 9
 The group arrived at the trailer at 9:53 a.m. Donald intercepted the four at the entry way of the trailer. He said he wanted to speak with Julie alone inside the trailer. Deputy Hovell asked Julie whether she wanted to enter and permitted her to go. Donald shut the door, leaving the three others outside. Marion heard Donald becoming argumentative, and could hear Donald following Julie, swearing at her, arguing with her and continually bothering her. Simon Dep. at 47. After four or five minutes, Deputy Hovell knocked on the door and said, "That is enough." He and Marion entered the trailer. Deputy Hovell did not try to interrupt the argument, order Donald out of the trailer, inquire about weapons in the house or otherwise separate Donald and Julie.
 
 
 10
 Donald and Julie continued to argue in the bedroom, while Marion, Deputy Hovell and Craig stood in the adjacent hallway. At just after 11:00 Donald produced a loaded gun and shot Julie once in the head and once in the neck. Deputy Hovell disarmed and arrested Donald. Julie died three days later.
 
 B. District Court Proceedings
 
 11
 The Losinskis' three children and Julie's estate filed suit against Trempealeau County, the Regent Insurance Company (insurer for the county), Sheriff McBride, Deputy Hovell and the Star Pool (insurer of the sheriff and deputy, as members of the Sheriff's Department). The first cause of action claimed damages under section 1983, 42 U.S.C. § 1983 (1988), for the county's alleged violation of Julie's rights under the due process clause. Plaintiffs claim that a "special relationship" developed between the County and Julie when the Sheriff's Department agreed to provide protection. The second count charges the sheriff under section 1983 with permitting a "discretionary arrest" policy that fails to implement the arrest requirements under Wisconsin's domestic abuse statute and the requirement of departmental policies to implement the requirement. Wis.Stat.Ann. § 968.075(3) (West 1985 & Supp.1990). Count three claims that Deputy Hovell was negligent under state law for failing to enforce the "no contact" TRO, failing to follow the mandatory arrest provisions of section 813.12(7),[1] failing to arrest Donald in violation of section 968.075[2] and failing to take precautions to protect Julie adequately. The fourth count claims under state law that the Sheriff is liable for negligently failing to implement written arrest policies and failing to train the deputies adequately.
 
 
 12
 The district court dismissed all of plaintiffs' claims on summary judgment. First, the court did not believe that this case would fit within the exception reserved by the Court in DeShaney. Reasoning that under DeShaney "[t]he state only has a constitutional duty to protect an individual when it has taken him or her into custody" and that "[t]his exception has been applied to state prisoners and involuntarily committed mental patients," the court concluded:
 
 
 13
 [Julie's] freedom to act on her own behalf was not restrained by institutionalization, incarceration or in any other way. The agreement by the Sheriff's Department to assist plaintiff in retrieving her belongings did not create a Constitutional duty on the part of the defendants to protect her against the violence of her husband.... Defendants McBride and Hovell did not violate the plaintiffs' constitutional rights by failing to protect Julie Losinski from the action of her husband.
 
 
 14
 Mem.Order at 8. Counts I and II were therefore dismissed pursuant to DeShaney. The court also dismissed Count II because Sheriff McBride had in fact adopted mandatory arrest procedures and, even if he had violated the state law, it would not be a constitutional violation. Reckless disregard of duty, reasoned the judge, does not support a due process claim for relief.
 
 
 15
 On the state law claims the judge first determined that Wisconsin law requires arrest if the petitioner shows the law enforcement officer a copy of the restraining order, or if the officer determines that such an order exists through communication with appropriate authorities and has probable cause to believe that the person has violated the order. He also determined that arrest is required if the police officer has reasonable grounds to believe that the person is committing or has committed domestic abuse, that the person's action constitutes the commission of a crime and that the officer has a reasonable basis for believing that there is a possibility of continued violence. The judge concluded that Deputy Hovell did not have reasonable grounds to believe that Donald was violating the domestic abuse restraining order. "The facts as presented do not even infer a crime or violation of a domestic abuse order was being committed by Donald Losinski in defendant Hovell's presence." Mem.Order at 12. The judge concluded, in the alternative, that even if probable cause existed, Deputy Hovell's decision that he did not have probable cause was a discretionary decision, for which he was immune under Wisconsin law.
 
 
 16
 The court also dismissed the state charge against Sheriff McBride because he had in fact developed such policies and provided the deputies with the required training. Moreover, even had he failed to develop the policies or train his deputies concerning the mandatory arrest practice, his action was not causally linked to Julie's death because Deputy Hovell did not have a legal basis for conducting an arrest.
 
 II.
 A. Standard of Review
 
 17
 Because the district court's decision was on summary judgment, our review is de novo, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), and we give the non-moving party the benefit of inferences from the evidence, Jeffries v. Chicago Transit Authority, 770 F.2d 676, 679 (7th Cir.1985), cert. denied, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986).
 
 B. Section 1983
 1. DeShaney
 
 18
 Our starting point is the Court's much-debated DeShaney decision. Joshua DeShaney had been severely beaten by his father. Although the Department of Social Services and several of its social workers received complaints about Joshua's abuse, they did not remove him from his father's custody. Joshua's father finally beat him so severely that he suffered permanent brain damage and became profoundly retarded.
 
 
 19
 The Court held that the Winnebago County Department of Social Services did not violate Joshua's due process rights. The essence of the Court's holding is that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." The Court continued, "[The due process clause] forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." 489 U.S. at 195, 109 S.Ct. at 1003. Apparently closing the door on most due process claims for violence by private actors, the Court retained an exception for certain instances where the state becomes responsible for a citizen's well being:
 
 
 20
 [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs, e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.... The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.... In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty--which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
 
 
 21
 489 U.S. at 200, 109 S.Ct. at 1005-06.
 
 
 22
 Plaintiffs argue that this case fits within this exception. They first contend that Julie was in the deputy's "protective custody" at the time of the incident. This argument is easily dismissed; Julie was neither coerced nor persuaded by the state to accept its protection. Custody implies restraint, which is simply not present here.
 
 
 23
 Plaintiffs' second argument is that by accompanying Julie to the trailer, the state became responsible for Julie's welfare. It is unlikely, the argument continues, that Julie would have proceeded to the trailer without the state's protection. DeShaney provides some support for this view by basing the "special relationship" exception in part on the state's role in increasing a citizen's risk of harm:
 
 
 24
 While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.
 
 
 25
 489 U.S. at 201, 109 S.Ct. at 1006.
 
 
 26
 While the issue is very close, we must conclude that the Losinskis' federal cause of action is precluded by DeShaney. The exception left intact by the Court contemplates either involuntary commitment and subjection to risk or state creation of the danger itself, neither of which Julie faced.
 
 
 27
 First, there is no evidence that the state acted to create the danger. The factual settings the opinion identifies as warranting an exception--prisons and mental hospitals--involve incarceration or a functional equivalent, where the state actually creates the risk of harm through confinement. See also Freeman v. Ferguson, 911 F.2d 52, 54 (8th Cir.1990) (exception when claim presented the possibility that "the violence the decedents were subjected to was not solely the result of private action, but that it was also the result of an affirmative act by a state actor to interfere with the protective services which would have otherwise been available in the community--with such interference increasing the vulnerability of decedents ... and possibly ratifying or condoning such violent actions"); Wood v. Ostrander, 879 F.2d 583 (9th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990) (exception when woman traveling in car impounded by state trooper was left to find her way home and was raped); Cornelius v. Highland Lake, 880 F.2d 348 (11th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990) (denying summary judgment when town clerk was abducted and held hostage for three days by inmate laborers who escaped from a supervised work project). Here, the state simply did not enhance the danger Julie faced.
 
 
 28
 Second, the state did not subject Julie involuntarily to an existing danger. Although the state walked with Julie as she approached the "lion's den," it did not force her to proceed. It did not encourage her to continue. And once the group arrived at the house on September 13, it did not require her to stay. Other cases have reasoned similarly, finding no DeShaney exception when the state does not contribute to the danger. See J.O. v. Alton Community Unit School Dist. 11, 909 F.2d 267 (7th Cir.1990) (due process protection does not extend to state's duty to protect school-age children from sexual assault by teachers: "Only where the state has exercised its power so as to render an individual unable to care for himself or herself may an affirmative duty to protect that individual arise."); Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. Philadelphia, 874 F.2d 156, 168 (3d Cir.1989) (denying claim under due process clause for funding of services for the mentally retarded living at home because " 'incarceration, institutionalization, or other similar restraint on personal liberty' is a prerequisite to the state's obligation to provide care") (quoting DeShaney ); Horton v. Flenory, 889 F.2d 454 (3d Cir.1989) (due process protects victim beaten to death by private party when police officer had been present and left victim in "custody" of private party).
 
 
 29
 We note that this case is clearly not on all fours with DeShaney. The Court's analysis there centered around the fact that had the state not acted, Joshua would have been in the same relationship with his father. "That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." 489 U.S. at 201, 109 S.Ct. at 1006. The same cannot be said for Julie. Had the deputy not accompanied Julie, she may not have proceeded "into the lion's den," given her expressions of fear and, indeed, her filing for the TRO.
 
 
 30
 Nonetheless, DeShaney compels our conclusion even if we assume (as we must, given the procedural posture of the case) that Deputy Hovell knew of Donald's violent tendencies prior to going to the trailer. The essence of the Court's exception in DeShaney is state creation of dangers faced or involuntary subjection to known risks. Neither element is evident here. Cf. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 700 (9th Cir.1990) (knowing failure of police to protect woman from menace of former husband not entitled to DeShaney exception).
 
 
 31
 The DeShaney vision of the substantive component of the due process clause has been debated from many perspectives. The vision of the state as wholly distinct from the individual, assuming indubitable obligations only when the state goes so far as to take the citizen into some form of custody is difficult to relate to the complex web of dependencies that characterize the modern state. However, since DeShaney does indeed state the law, we conclude that the exception it contemplates does not include the Losinskis' section 1983 claim.
 
 
 32
 2. State Law or Common Law Duty Under Section 1983
 
 
 33
 Plaintiffs also argue that Deputy Hovell had a duty under Wisconsin law to arrest Donald and that Sheriff McBride had a duty to implement abuse policies that would have protected her. We deal with the substantive aspects of these claims below. Even if state or common law creates such a duty, plaintiffs' argument that this gives rise to a section 1983 cause of action is mistaken. An en banc opinion of this circuit, Archie v. Racine, 847 F.2d 1211 (7th Cir.1987) (en banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989), foreclosed section 1983 claims for violations of state law. "A state ought to follow its law, but to treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law. State rather than federal courts are the appropriate institutions to enforce state rules." Id. at 1217 (citing Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)); see also DeShaney, 489 U.S. at 201-02, 109 S.Ct. at 1006-07 (disavowing any duty created under the due process clause by state statutory requirements). The only exception the Archie opinion noted occurs when state law defines "property," which the due process clause also protects.
 
 
 34
 Neither does the plaintiffs' claim of a common law negligence duty constitute a section 1983 cause of action. The Supreme Court has made this clear. DeShaney, 489 U.S. at 202, 109 S.Ct. at 1007 (due process clause "does not transform every tort committed by a state actor into a constitutional violation") (citing Daniels v. Williams, 474 U.S. 327, 335-36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986); Parratt v. Taylor, 451 U.S. 527, 544, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981); Martinez v. California, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980); Baker v. McCollan, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979); Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976)).
 
 
 35
 Counts I and II therefore fail to meet the requirements for a section 1983 cause of action.
 
 C. State Law Claims[3]
 
 36
 Under Wisconsin law, a negligence claim requires (i) a duty of care on the part of the defendant, (ii) a breach of that duty, (iii) a causal connection between the conduct and the injury and (iv) an actual loss or damages as a result of the injury. Lloyd v. S.S. Kresge Co., 85 Wis.2d 296, 301, 270 N.W.2d 423, 425 (App.1978). At issue here is whether Deputy Hovell or Sheriff McBride breached a duty that would have kept Julie from harm. If a duty exists, we must also assess whether immunity shields the deputy or sheriff from suit.
 
 1. Sheriff McBride (Count IV)
 
 37
 Plaintiffs claim that Sheriff McBride failed to develop procedures for handling domestic abuse situations, failed to implement the "mandatory arrest" requirement of Wis.Stat. § 968.075 and failed to train his deputies adequately to protect Julie. However, the record indicates that Sheriff McBride did implement a policy in compliance with section 968.075(3)'s requirement. He stated in his deposition that the policy follows a model policy issued by the Wisconsin Attorney General's office and that all of the road deputies, including Deputy Hovell, had been trained in the policy's requirements. McBride Dep. at 20-21, 28; see also Stoner Dep. at 23-27 (affirming existence of policy); Hovell Aff. at para. 3 (affirming training).
 
 
 38
 The only evidence offered by plaintiffs suggesting the absence of such a policy is a brief statement in a LaCrosse Tribune article covering the Losinski incident which states, "The Sheriff said he could never draw up guidelines or a policy to cover such domestic situations." This does not demonstrate a genuine issue of material fact given the documentation of the sheriff's policy and the vague nature of the newspaper excerpt. The grant of summary judgment as to Sheriff McBride was therefore proper.
 
 2. Deputy Hovell (Count III)
 
 39
 Count III alleges that Deputy Hovell breached his duty to protect Julie. Wisconsin law recognizes that a duty of care may be assumed by undertaking to do an act--such as protection--which the law otherwise does not require:
 
 
 40
 Although one may have no duty to perform an act, if he attempts to do something to another even although gratuitously he must exercise reasonable care.
 
 
 41
 Wulf v. Rebbun, 25 Wis.2d 499, 503, 131 N.W.2d 303, 306 (1964); see also American Mut. Liability Ins. Co. v. St. Paul Fire & Marine Ins. Co., 48 Wis.2d 305, 313, 179 N.W.2d 864, 868 (1970); Murawski v. Brown, 51 Wis.2d 306, 313, 187 N.W.2d 194, 197-98 (1971); Maynard v. Madison, 101 Wis.2d 273, 278, 304 N.W.2d 163, 166-67 (App.1981). The Restatement also recognizes this duty:One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.
 
 
 42
 Restatement (Second) of Torts § 323 (1965); see also Glanzer v. Shepard, 233 N.Y. 236, 239, 135 N.E. 275, 276 (1922) ("It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.") (Cardozo, J.) (citations omitted).
 
 
 43
 This duty is supported by Wisconsin's statutory requirements that an arrest be made when a law enforcement officer has probable cause to believe the terms of a TRO are being violated, Wis.Stat. § 813.12(7), and that an arrest be made when there is a "reasonable basis" for suspecting continued abuse, Wis.Stat. § 968.075(2). The court here found as a matter of law that probable cause did not exist and that Deputy Hovell therefore did not fail in his duty.
 
 
 44
 Even accepting the district court's decision on probable cause, this does not exhaust the scope of the deputy's duty. First, the statutes do not define the limit of the duty to protect. Breach of a statutory duty where the statute protects a class of persons from a particular type of harm supports a finding of per se negligence. See Lukaszewicz v. Ortho Pharmaceutical Corp., 510 F.Supp. 961, 964, amended, 532 F.Supp. 211 (E.D.Wis.1981); Walker v. Bignell, 100 Wis.2d 256, 301 N.W.2d 447 (1981). But failing to make a per se case does not imply that the actor was not negligent. Even if the deputy did not violate the Wisconsin statutes in failing to make an arrest, this does not extinguish the duty to provide protection; it only eliminates the per se presumption. Johnson v. Seipel, 152 Wis.2d 636, 449 N.W.2d 66 (App.1989).
 
 
 45
 Second, we think that reading the record in the light most favorable to the plaintiffs indicates that the deputy may have had reason to believe Donald would commit domestic abuse during the encounter at the trailer. The district court concluded otherwise: "[Deputy Hovell] did not have reasonable grounds to believe that immediately prior to the shooting Donald was committing domestic abuse or his actions constituted a crime." Mem.Order at 12. But the statute provides that the deputy must also arrest if there are reasonable grounds to believe the commission of a crime is occurring (which, given the continued validity of the "no contact" TRO, could have been the case) and the officer has a reasonable basis for believing there is a possibility of continued violence. There is therefore a material issue of fact as to whether the deputy's actions violated section 968.075(2).
 
 
 46
 We therefore conclude that Deputy Hovell faced a duty of reasonable care and that there is a material dispute as to whether the deputy violated section 968.075(2).
 
 3. Immunity
 
 47
 The district court also held that Deputy Hovell was entitled to immunity because in determining whether "probable cause" warranted the arrest of Donald, the deputy performed a "discretionary function" within the scope of his duties and was performing a quasi-judicial function. Wis.Stat.Ann. § 893.80(4) (West 1983). The Wisconsin Supreme Court has stated, "There is general personal tort immunity for a public official acting within the scope of his official authority and in the line of his official duties." Cords v. Anderson, 80 Wis.2d 525, 539, 259 N.W.2d 672, 679 (1977). The court noted that immunity does not apply to a " 'purely ministerial duty,' " where the duty is " 'absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.' " Id. at 541, 259 N.W.2d at 679 (quoting Lister v. Board of Regents, 72 Wis.2d 282, 300-01, 240 N.W.2d 610, 621 (1976)); see also C.L. v. Olson, 143 Wis.2d 701, 422 N.W.2d 614 (1988).
 
 
 48
 We disagree with the district court's conclusion that the deputy was entitled to immunity. Once Deputy Hovell assumed the duty to protect, his obligation was no longer discretionary. Even if the determination of probable cause is inherently discretionary, the broader duty to protect was not one subject to Deputy Hovell's discretion. He could not, for example, have abandoned Julie at the house after encountering Donald and claim that he was entitled to do so because of discretion. Once the deputy acted, the discretion that may otherwise attach to his position diminished. The deputy therefore was not entitled to immunity for the decisions he made at the Losinskis' trailer home on September 13.
 
 
 49
 Comparison to the factual setting in Cords is instructive. In that case a park manager, charged with the duty of protecting against park dangers, was not granted immunity for failing either to alert his superiors about a sharp drop-off on a hiking trail or alternatively to erect signs warning of the danger. The court stated:
 
 
 50
 The question here is whether the defendant Anderson had an absolute, certain, or imperative duty to either place the signs warning the public of the dangerous conditions existing on the upper trail or to advise his superiors of the condition with a view toward adequate protection of the public responding to the invitation to use this facility. There comes a time when "the buck stops." Anderson knew the terrain at the glen was dangerous particularly at night; he was in a position as park manager to do something about it; he failed to do anything about it. He is liable for the breach of this duty.
 
 
 51
 Id. 80 Wis.2d at 541, 259 N.W.2d at 679-80. Similarly, a reasonable inference from the record is that Deputy Hovell knew the dangers that Julie faced, since he knew of the TRO and had been warned of Donald's dangerous propensities. The duty to protect was therefore clear, making it nondiscretionary.
 
 
 52
 The district court also concluded that Sheriff McBride was entitled to immunity. Whether the sheriff's duties were similarly ministerial or discretionary has become moot since the record shows that he discharged his duty to the extent required.
 
 III.
 
 53
 The district court's decision finding no liability under section 1983 is AFFIRMED. The grant of summary judgment as to Sheriff McBride is AFFIRMED, but the finding of summary judgment for Deputy Hovell under state law is REVERSED and REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 This provision states that arrest is mandatory if the officer knows about a court-ordered restriction and has probable cause to believe that the person restrained by the order is violating its terms. Wis.Stat.Ann. § 813.12(7) (West 1985 & Supp.1990)
 
 
 [2]
 The statute provides:
 (2) Circumstances requiring arrest.
 (a) ... [A] law enforcement officer shall arrest and take a person into custody if:
 
 
 [1]
 The officer has reasonable grounds to believe that the person is committing or has committed domestic abuse and that the person's actions constitute the commission of a crime; and
 
 
 [2]
 Either or both of the following circumstances are present:
 a. The officer has a reasonable basis for believing that continued domestic abuse against the alleged victim is likely.
 b. There is evidence of physical injury to the alleged victim.
 Wis.Stat.Ann. § 968.075(2) (West 1985 & Supp.1990). An earlier version of the statute phrases subsection 2(a) slightly differently: "The officer has a reasonable basis for believing that there is a possibility of continued violence against the alleged victim." The district court uses the earlier version. Given the circumstances of this case, the difference in wording does not affect our analysis.
 
 
 [3]
 Although the plaintiffs have no federal cause of action and therefore no pendent jurisdiction, their state law claims survive on the basis of diversity jurisdiction. Julie and the children appear to have moved their domicile to Winona, Minnesota, after leaving the trailer on September 2. All of the defendants reside or have their principal place of business in Wisconsin or Illinois. In addition, the matter in controversy exceeds $50,000. On the facts in the record, diversity therefore appears complete and jurisdiction is proper